**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 6, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT
_____

In re: WINTER STORM URI NATURAL
GAS LITIGATION

------------------------------

RUSS MEHL; EDMUND GROSS;
TRUDY BOYER; STEVE ANDERSON;
GREGORY STEADMAN; PJ
STONEBERGER; ROBIN GUDDE;
REGEANA SHELTON; DAVID J.
REBEIN; DANIEL B. GIROUX;
MICHAEL T. JILKA; ELI DEUTSCHER;
DARYL GREGG; LUKE OBORNY;
NEAL WARD; MARIA RICE; GERALD
SMITH; USHA RAFFERTY, individually
and on behalf of a class of similarly
situated residents of Kansas,

     Plaintiffs - Appellants,

v.

BP ENERGY COMPANY; SOUTHWEST
ENERGY, LP; MACQUARIE ENERGY,
LLC; ROCKPOINT GAS STORAGE,
LLC; TENASKA MARKETING
VENTURES; CIMA ENERGY, LTD.;
SOUTHWEST ENERGY
CORPORATION; BP CANADA
ENERGY MARKETING CORP.;
MERCURIA ENERGY AMERICA, INC.;
NEXTERA ENERGY MARKETING,
LLC; SPOTLIGHT ENERGY, LLC;
WILLIAMS ENERGY RESOURCES
LLC; CIMA ENERGY, LP; CONCORD
ENERGY, LLC; ETC MARKETING,

No. 25-3046

LTD.; KANSAS GAS SERVICE,

     Defendants - Appellees.

_____

In re: WINTER STORM URI NATURAL
GAS LITIGATION

------------------------------

PJ STONEBERGER; ROBIN GUDDE;
REGEANA SHELTON, individually and
on behalf of a class of similarly situated
residents of Kansas,

     Plaintiffs - Appellants,

v.                                                                    No. 25-3047

BP ENERGY COMPANY; CIMA
ENERGY, LTD., a/k/a CIMA Energy, LP;
MACQUARIE ENERGY, LLC;
SOUTHWEST ENERGY
CORPORATION, a/k/a Southwest Energy,
LP,

     Defendants - Appellees.

_____

In re: WINTER STORM URI NATURAL
GAS LITIGATION

------------------------------

RUSS MEHL; EDMUND GROSS;
TRUDY BOYER; STEVE ANDERSON;
GREGORY STEADMAN, all individually
and on behalf of a class of similarly
situated residents of Kansas,

     Plaintiffs - Appellants,

v.                                                                    No. 25-3049

2

BP ENERGY COMPANY; SOUTHWEST ENERGY, LP; MACQUARIE ENERGY, LLC; ROCKPOINT GAS STORAGE, LLC; ETC MARKETING, LTD.; TENASKA MARKETING VENTURES,

      Defendants - Appellees.

_____

In re: WINTER STORM URI NATURAL GAS LITIGATION

------------------------------

DANIEL B. GIROUX; MICHAEL T. JILKA; DAVID J. REBEIN,

      Plaintiffs - Appellants,

v.

BP CANADA ENERGY MARKETING CORP.; BP ENERGY COMPANY; MACQUARIE ENERGY, LLC; TENASKA MARKETING VENTURES; SOUTHWEST ENERGY, LP; MERCURIA ENERGY AMERICA, INC.,

      Defendants - Appellees.

No. 25-3050

_____

In re: WINTER STORM URI NATURAL GAS LITIGATION

------------------------------

MARIA RICE; GERALD SMITH; USHA RAFFERTY, all individually and on behalf of all others similarly situated,

      Plaintiffs - Appellants,

3

v.                                                     No. 25-3051

SOUTHWEST ENERGY, L.P.;
NEXTERA ENERGY MARKETING,
LLC; MACQUARIE ENERGY, LLC;
SPOTLIGHT ENERGY, LLC;
WILLIAMS ENERGY RESOURCES,
LLC; CIMA ENERGY, L.P.; TENASKA
MARKETING VENTURES; CONCORD
ENERGY, LLC,

     Defendants - Appellees.

_____

In re: WINTER STORM URI NATURAL
GAS LITIGATION

  -------------------------------

ELI DEUTSCHER; DARYL GREGG;
LUKE OBORNY; NEAL WARD,
individually and on behalf of all others
similarly situated,

     Plaintiffs - Appellants,

v.                                                     No. 25-3052

TENASKA MARKETING VENTURES;
MACQUARIE ENERGY, LLC,

     Defendants - Appellees.

_____

**Appeals from the United States District Court
for the District of Kansas
(D.C. No. 6:24-CV-01073-DDC-ADM)
(D.C. No. 6:23-CV-01195-DDC-ADM)
(D.C. No. 6:23-CV-01192-DDC-ADM)
(D.C. No. 6:23-CV-01245-DDC-ADM)
(D.C. No. 6:24-CV-01005-DDC-ADM)
(D.C. No. 6:23-CV-01249-DDC-ADM)**

_____

4

Samuel J. Walenz of Foulston Siefkin LLP, Wichita, Kansas (Jay F. Fowler and Clayton J. Kaiser of Foulston Siefkin LLP, Wichita, Kansas; Scott C. Nehrbass, Lee M. Smithyman, James P. Zakoura, and Jacob T. Schmidt of Foulston Siefkin LLP, Kansas City, Kansas, with him on the briefs), for Plaintiffs-Appellants.

Beatrice C. Franklin of Susman Godfrey L.L.P., New York, New York (Stephen R. McAllister and Megan M. Carroll of Dentons US LLP, Kansas City, Missouri; and Alan R. Pfaff of Wallace Saunders, Wichita, Kansas; William R.H. Merrill, Alexandra Foulkes Grafton, and Megan E. Griffith of Susman Godfrey LLP, Houston, Texas; Michael Yuffee of Baker Botts L.L.P., Washington D.C.; Casey L. Jones of Hinkle Law Firm LLC, Wichita, Kansas; Richard C. Pepperman II, Amanda F. Davidoff and Michael P. Devlin of Sullivan & Cromwell LLP, New York, New York; Jeffrey D. Morris of Berkowitz Oliver, LLP - KCMO, Kansas City, Missouri; Stephen Crain and Bradley J. Benoit of Bracewell LLP, Houston, Texas; Matthew D. Moderson of Stinson LLP, Kansas City, Missouri; Andrew Zeve and Kyle A. Mason of White & Case LLP, Houston, Texas; Chantale Fiebig, Claire L. Chapla and Laurel Zigerelli of Weil, Gotshal & Manges LLP, Washington, D.C.; Shane A. Rosson and Tyler E. Heffron of Triplett Woolf Garretson LLC, Wichita, Kansas; Johanna Spellman of Latham & Watkins LLP, Chicago, Illinois; Louis Layrisson and Liam O'Rourke of Baker Botts L.L.P., Houston, Texas; Casey O. Housley of Sanders Warren & Russell, LLP, Overland Park, Kansas; David T. McDowell, Mary E. Green and William B. Thomas of McDowell Hetherington LLP, Houston, Texas; Nathan M. Saper of Latham & Watkins LLP, Los Angeles, California; Nicholas J. Boyle and Melissa Arbus Sherry of Latham & Watkins LLP, Washington, D.C.; Robert J. Malionek of Latham & Watkins LLP, New York, New York; William Perry Brandt of Sandberg Phoenix & Von Gontard, PC, Kansas City, Missouri; John F. Bash, III of Quinn Emanuel Urquhart & Sullivan, LLP, Austin, Texas; Todd E. Shadid of Klenda Austerman LLC, Wichita, Kansas; David E. Harrell, Jr. and Deanna Markowitz Willson of Troutman Pepper Locke, Houston, Texas; Torsten M. Kracht of Hunton Andrews Kurth LLP, Washington, D.C.; Christopher M. Pardo of Hunton Andrews Kurth LLP, Boston, Massachusetts; Leah Nommensen of Hunton Andrews Kurth LLP, Houston, Texas; Seth E. Montgomery of Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, California; Tristan L. Duncan, Steven D. Soden and Holly Pauling Smith of Shook, Hardy & Bacon LLP, Kansas City, Missouri, with her on the briefs), for Defendants-Appellees.

_____

Before **HOLMES**, Chief Judge, **HARTZ**, Circuit Judge, and **GARCIA**[*], District Judge.

_____

_____

[*] The Honorable Matthew L. Garcia, U.S. District Judge, District of New Mexico, sitting by designation.

5

**HARTZ**, Circuit Judge.

_____

Plaintiffs are Kansas residential consumers of natural gas. They purchase gas from local distributors who in turn purchase gas from interstate wholesalers. They have sued the wholesalers for violating the Kansas Consumer Protection Act (KCPA), K.S.A. §§ 50-623–643, alleging that the wholesalers profiteered during a winter-weather emergency that brought arctic temperatures to the State, causing unprecedented increases in state-regulated retail natural-gas prices. The rates charged by these wholesalers are regulated by the Federal Energy Regulatory Commission (FERC) under the Natural Gas Act (NGA), 15 U.S.C. §§ 717–717z.

The issue before us is whether the NGA preempts Plaintiffs' claims against the wholesalers. We hold that it does. As the Supreme Court has said, it is "well settled" that "Congress occupied the field of matters relating to wholesale sales and transportation of natural gas in interstate commerce." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 305 (1988). These lawsuits directly target such sales. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's judgment.

## I.    BACKGROUND

This appeal arises from the consolidation of five class actions. Each action was brought by residential consumers within a distinct geographical region in Kansas— "with each region having its own natural gas distributor." *In re Winter Storm Uri Natural Gas Litig.*, 772 F. Supp. 3d 1246, 1251 (D. Kan. 2025). The regional distributors are Kansas Gas Service (KGS), Kansas Municipal Gas Agency (KMGA),

Black Hills, Midwest Energy, and Atmos Energy Corporation (Atmos). *See id.* But

Plaintiffs did not sue these distributors, and the distributors are not parties. Rather,

Plaintiffs sued 14 "natural gas producers or suppliers" from whom these distributors

purchased gas during Winter Storm Uri. *Id.* They allege that Defendants sold natural

gas to distributors "at exorbitant prices in excessively one-sided transactions,"

violating the KCPA. *See id.* Because many of the allegations are identical, we

describe the background facts and allegations common to all the complaints. (We

follow the district court's practice of citing only to the record of the first filed case

(*Mehl v. BP Energy Co.*, No. 23-1192). *See id.* at 1252–53.)

### A.     Factual Background

#### 1.     *The natural-gas market*

In general, natural gas travels through three steps of commerce to reach a

consumer. First, producers and suppliers drill wells and pump natural gas, which they

process and deliver to interstate pipelines. Next, the interstate pipelines deliver the

gas to local distributors and, in some instances, directly to large business consumers.

Finally, these distributors resell the gas to businesses and residential consumers in

their markets. The natural-gas market thus encompasses wholesales (that is, sales of

gas for resale) and retail transactions (direct-to-consumer sales).

Local distributors typically negotiate three types of agreements with

wholesalers: baseload-gas, callable-gas, and spot-gas contracts. Each type of contract

serves a distinct purpose; together, they help distributors hedge against fluctuations

in gas prices while providing flexibility. The pricing for natural gas in each contract

7

is often tied to publications by S&P Global Platts (Platts), described by Defendants as "the leading independent provider of benchmark prices for commodities markets, including the natural-gas market." Aplees. Br. at 7. In that role, Platts "collects data on natural-gas trades and publishes both daily and monthly price indexes for various trading locations for natural gas." *Id.* (internal quotation marks omitted).

Local distributors negotiate baseload-gas contracts months in advance for quantities that reflect historical usage. For instance, a contract for baseload gas may be negotiated in the summer so that natural gas can be scheduled for storage and delivery when natural-gas usage is high. The price for baseload gas is usually tied to a "first of the month" price survey (a monthly price) published in the *Platts Inside FERC Gas Market Report*. Aplts. App., Vol. 1 at 190 (First Amended Class-Action Complaint). Callable-gas contracts allow distributors to reserve additional volumes of gas in case the seasonal use turns out to be higher than historical usage levels. These additional volumes of natural gas are typically purchased as needed at a price determined on the day of the call for purchase, with prices based on the *Platts Gas Daily* market report. Suppliers often charge to reserve this additional gas. And distributors make spot-gas purchases when demand exceeds the combined volumes of their baseload gas and reserved callable gas. Distributors contract for spot gas "at the time or near the time of use," and for "a premium above the Gas Daily price for the day of use." *Id.* at 191. Ordinarily, the cost of the gas to the distributor is automatically passed on to the consumer.

2.    *Winter Storm Uri*

8

In February 2021, Winter Storm Uri hit Kansas. The storm's subzero temperatures not only spiked demand for gas but also created serious supply challenges because wellheads froze throughout the midcontinent region. The net effect: natural-gas prices soared. *See In re Winter Storm Uri*, 772 F. Supp. 3d at 1253. Although Platts' February first-of-the-month index prices for sectors in the region were between $2.545 and $2.580/MMBtu, the storm caused prices to rise as high as $622.785/MMBtu, 20 times the 15-year peak. *See* Aplts. App., Vol. 1 165–71 (First Amended Class-Action Complaint); *In re Winter Storm Uri*, 772 F. Supp. 3d at 1254.

The Kansas Governor declared a State of Disaster Emergency. *See Rec. Nat. Gas Prices and Potential Sys. Reliability Issues from Unprecedented and Sustained Cold Weather*, No. 21-GIMX-303-MIS, at 1 (Kan. Corp. Comm'n, Feb. 15, 2021) (emergency order), http://estar.kcc.ks.gov/estar/ViewFile.aspx?Id=20da2a43-e05a-4255-aee4-deb442fcb6fb [https://perma.cc/HCY3-HFQY]. And the Kansas Corporation Commission (KCC)—the state regulator that oversees intrastate and retail natural-gas sales—ordered local distributors and others "to do all things possible and necessary to ensure" natural-gas service "continue[d] to be provided to their customers in the State." *Id.* at 3. The KCC also authorized local distributors incurring "extraordinary costs associated with" doing so to "defer those costs" "to minimize the financial impacts of [the storm] on ratepayers over a reasonable time frame." *Id.*

9

In response to the KCC's order, Kansas natural-gas distributors "made substantial purchases of natural gas at the prevailing spot price to ensure their storages of natural gas would not run low." Aplts. App., Vol. 1 at 169 (First Amended Class-Action Complaint). All five distributors deferred the costs for these purchases and shifted them downstream to their consumers. The KCC approved a ten-year repayment window for KGS and Atmos consumers. Black Hills struck a settlement agreement with the KCC that enabled it to recover its excess costs from its consumer base over a five-year term.[1] KMGA relied on a different public mechanism (a legislative low-interest loan program) to do the same. And Midwest Energy recovered its charges from consumers over a two-year period.

After Winter Storm Uri, FERC's Office of Enforcement investigated the wholesale transactions during the storm to determine whether there had been market manipulation or other misconduct. *See* FERC, *2021 Report on Enforcement* 79–80 (2021), https://ferc.gov/media/fiscal-year-2021-annual-report-enforcement

---

[1] As Plaintiffs note, the KCC "opened dockets to resolve how ratepayers would ultimately pay for Defendants' charges to" three distributors—KGS, Atmos, and Black Hills. Aplts. Br. at 16. Each docket resulted in a unanimous settlement agreement. Before approving the financial plans underlying the distributors' proposed settlements, the KCC received testimony from the local distributors, expert agency staff, and consumer advocates. After doing so, it "independent[ly]" assessed whether each proposed settlement agreement was (1) "supported by substantial competent evidence in the record as a whole," (2) would "establish just and reasonable rates," and (3) was "in the public interest." *E.g.*, Order Approving Unanimous Settlement Agreement on Kansas Gas Services' Financial Plan at 8–12, *Application of Kansas Gas Serv. for the Recovery of Qualified Extraordinary Costs and Issuance of a Fin. Order,* No. 22-KGSG-466-TAR (Kan. Corp. Comm'n Aug. 18, 2022) https://kcc-connect.kcc.ks.gov/s/order/a1Jcr000005QUcFEAW/221488 [https://perma.cc/Z5K2-J938].

[https://perma.cc/B9T4-TNSY]. The investigation did not result in any enforcement action.

### B.    The Litigation

Plaintiffs filed five class-action suits (six including the consolidated suit) claiming violations of the KCPA and seeking to recover the "extraordinary or excess costs" that "Defendants' sales imposed" on "Plaintiffs' distributors, that Plaintiffs' distributors passed through to Plaintiffs and other customers" during Winter Storm Uri. Aplts. Br. at 16. Plaintiffs assert that Defendants' transactions in the wholesale market impacted the retail market, where they are "captive"—that is, unable to negotiate the prices they pay for the gas. *Id.* at 17. They allege that Defendants "cut each of Plaintiffs' distributors' baseload supplies of gas," forcing the local distributors into "the exponentially higher-priced spot market." *Id.* at 12. "Then, every Defendant entered that market to charge unconscionable prices." *Id.* Plaintiffs contend that "[a]ll the while," the "actual supply of natural gas [during Winter Storm Uri] was always available for sale at baseload rates." *Id.* at 15. And "even if a Defendant was not one who cut [a distributor's] baseload supply, every Defendant was more than willing to sell them spot gas at exponentially higher and unconscionable prices, all in the middle of a declared disaster." *Id.* at 15–16.

Defendants moved to dismiss jointly and individually. The district court granted Defendants' joint motion (denying the individual motions as moot), holding that FERC's exclusive jurisdiction over the interstate wholesale natural-gas market

11

under the NGA preempts Plaintiffs' state-law claims. *See In re Winter Storm Uri*, 772 F. Supp. 3d at 1252. We agree.

## II.     DISCUSSION

We review de novo a district court's grant of a motion to dismiss, accepting as true the well-pleaded allegations of the complaint. *See Nakkumpun v. Taylor*, 782 F.3d 1142, 1146 (10th Cir. 2015). We also consider the documents incorporated by reference into the complaint. *See id.*

### A.     Preemption

"The Supremacy Clause provides that 'the Laws of the United States' (as well as treaties and the Constitution itself) 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015) (quoting U.S. Const., art. VI, cl. 2). Under this provision, Congress may enact statutes that preempt (that is, invalidate) state law. *See id.*

We have recognized three types of preemption: (1) "express preemption, which occurs when the language of the federal statute reveals an express congressional intent to preempt state law"; (2) "field preemption, which occurs when the federal scheme of regulation is so pervasive that Congress must have intended to leave no room for a State to supplement it"; and (3) "conflict preemption, which occurs either when compliance with both the federal and state laws is a physical impossibility, or when the state law stands as an obstacle to the accomplishment and

execution of the full purposes and objectives of Congress." *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1324 (10th Cir. 2010) (internal quotation marks omitted).

Defendants primarily argue field preemption.[2] They contend that the NGA field-preempts Plaintiffs' KCPA claims because those claims challenge transactions and practices in the interstate wholesale natural-gas market, a market that Congress carved out for federal oversight. We first address the NGA's background and structure and then turn to our preemption analysis.

### B.    The Natural Gas Act

A century ago the States regulated the production and gathering of natural gas, the transportation of the gas to distributors, and the distribution to local consumers. *See Oneok*, 575 U.S. at 378. But then the Supreme Court held that the Dormant Commerce Clause prohibited state regulation of "the *interstate* shipment and sale of gas to local distributors for resale." *Id.* (emphasis added). To fill this "regulatory gap," Congress enacted the NGA, *id.*, declaring that federal regulation of the transportation and sale of natural gas "in interstate and foreign commerce is necessary in the public interest," 15 U.S.C. § 717(a).

---

[2] They also argue that conflict preemption precludes Plaintiffs' claims. Defendants' conflict-preemption argument is that Plaintiffs challenge index prices that were informed by wholesale trades, and FERC has the sole authority to declare wholesale prices unreasonable. Because FERC investigated wholesale trades following Winter Storm Uri and determined that they were reasonable, "[s]tate and federal law would be in direct conflict if Defendants' wholesale prices now were to be declared unlawful under the KCPA." Aplees. Br. at 17; *see id.* at 37–41. But we need not address conflict preemption, because Defendants prevail on field preemption.

13

The NGA empowers FERC (initially the Federal Power Commission) to regulate rates for "the wholesale sale of gas in interstate commerce." *Ark. Elec. Co-op Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 378 (1983). It is "a comprehensive scheme of federal regulation of all *wholesales* of natural gas in interstate commerce." *Schneidewind*, 485 U.S. at 300 (emphasis added) (internal quotation marks omitted); *see Ill. Nat. Gas Co. v. Cent. Ill. Pub. Serv. Co.*, 314 U.S. 498, 507 (1942) (FERC maintains "extensive control over the rates at which [natural] gas is sold for resale"). This scheme grants FERC jurisdiction over "the transportation of natural gas in *interstate* commerce" and "the sale in *interstate* commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use." 15 U.S.C. § 717(b) (emphasis added). (Sales over which FERC has jurisdiction are sometimes referred to as *jurisdictional sales*. See Oneok*, 575 U.S. at 379.) The statute also gives FERC jurisdiction over "natural-gas companies engaged in such transportation or sale, and . . . the importation or exportation of natural gas in foreign commerce." 15 U.S.C. § 717(b); *see Schneidewind,* 485 U.S. at 308 ("[T]he control of rates and facilities of natural gas companies[] are precisely the things over which FERC *has comprehensive authority*" (emphasis added)).

The NGA requires that wholesale natural-gas rates and charges be "just and reasonable." 15 U.S.C. § 717c(a). If FERC deems that any wholesale rate, charge, or classification within its jurisdiction, or "any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly

14

discriminatory, or preferential, [FERC] *shall determine* the just and reasonable rate, charge, classification, rule, regulation, practice, or contract" and order its determination to be "observed and in force." *Id.* § 717d(a) (emphasis added). Similarly, "where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates," Congress empowers FERC (not the States) to "order" that rate be decreased. *Id.*

But Congress was careful to preserve for the States an oversight role in the country's natural-gas market. As the Supreme Court has recognized, the NGA was crafted with "meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way." *Oneok,* 575 U.S. at 388 (internal quotation marks omitted). Accordingly, the NGA does not govern retail sales made directly to consumers or "the *local* distribution of natural gas." 15 U.S.C. § 717(b) (emphasis added); *see Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n of Ind.*, 332 U.S. 507, 517 (1947) (the NGA excluded "[d]irect sales for consumptive use" from FERC's exclusive jurisdiction, leaving this role to the States). Also exempted from federal jurisdiction are sales by intrastate distributors who receive the gas at the border of or within a State when all the gas is consumed within that State and the transactions are subject to regulation by the State. *See* 15 U.S.C. § 717(c).

### C.    Field Preemption in This Case

Defendants contend that the NGA field-preempts Plaintiffs' KCPA claims because those claims challenge transactions and practices in the interstate wholesale natural-gas market, a market subject to FERC's exclusive jurisdiction. Plaintiffs do

15

not dispute that the conduct they challenge consisted of interstate wholesale transactions. Instead, they argue that Defendants' misconduct in the federal *wholesale* market affected the state *retail* market in such a manner that they may maintain a state-law consumer-protection claim against wholesale-market participants.[3] In effect, Plaintiffs' argument is that the impact of these wholesale transactions on the retail market was so extensive during Winter Storm Uri that jurisdiction should fall to the States. We are not persuaded.

*Oneok* is the leading case. The plaintiffs asserted state-law antitrust claims against interstate-pipeline companies. *See Oneok*, 575 U.S. at 383. Plaintiffs were "a group of manufacturers, hospitals, and other institutions," *id.* at 376, that had bought "large quantities of natural gas directly from interstate pipelines for their own consumption" and "believe[d] that they overpaid in [those] transactions due to the interstate pipelines' manipulation of the natural-gas indices," *id.* at 383. (Because these were retail transactions (direct sales to ultimate consumers), they were not subject to regulation by FERC.) Among the practices challenged by the plaintiffs in *Oneok* was the interstate pipelines' deceptive conduct in the natural-gas market, including "false price reporting, wash trades, and anticompetitive collusive

---

[3] Plaintiffs argue that our preemption analysis must consider two presumptions—(1) "that Congress has not preempted state law in areas traditionally regulated by the States," Aplts. Br. at 29 (internal quotation marks omitted), and (2) "that Congress did not act to remove all means of judicial recourse for those injured by illegal conduct," *id.* at 31 (internal quotation marks omitted). We question the relevance of the asserted presumptions to this case. But in any event, we need not consider them here. When the Supreme Court has directed how to analyze preemption under a specific statute, we are reluctant to depart from that direction.

behavior." *Id*. at 383 (internal quotation marks omitted). The pipelines allegedly submitted deceptive reports of actual and fictitious jurisdictional and nonjurisdictional sales. *See In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 725, 730–35 (9th Cir. 2013), *aff'd sub nom., Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015). As a result, index prices—which are used to price both jurisdictional and nonjurisdictional sales—were artificially raised. *See Oneok*, 575 U.S. at 381–83.

The defendants responded that the state-law antitrust claims were field-preempted by the NGA. Although the antitrust suit sought "damages for excessively high *retail* natural-gas prices stemming from interstate pipelines' price manipulation," the defendants "point[ed] out that [the] antitrust claims target[ed] anticompetitive activities [the manipulation of price indices] that affected wholesale (as well as retail) rates," and that the NGA "grants FERC authority to keep wholesale rates at reasonable levels." *Id.* at 384.

The Supreme Court rejected the field-preemption argument. *See id.* at 384–88. The Court began its analysis by stressing that the NGA "was drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way." *Id.* at 385 (internal quotation marks omitted). After all, the NGA "expressly provides that States retain jurisdiction over *intrastate* transportation, local distribution, and distribution facilities, and over the production or gathering of natural gas." *Id*. at 379 (internal quotation marks omitted). "Accordingly," said the Court, "where (as here) a state law can be applied to nonjurisdictional as well as

17

jurisdictional sales, we must proceed cautiously, finding pre-emption only where detailed examination convinces us that a matter falls within the pre-empted field as defined by our precedents." *Id.* at 385. It continued, "Those precedents emphasize the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted." *Id.* In particular, "the significant distinction for purposes of pre-emption in the natural-gas context is the distinction between measures *aimed directly at* interstate purchasers and wholesales for resale, and those aimed at subjects left to the States to regulate." *Id.* (internal quotation marks omitted).

The Court concluded that the antitrust lawsuits before it were "directed at practices affecting *retail* rates—which are firmly on the States' side of [the] dividing line" between state regulation not preempted by the NGA and regulation so preempted. *Id.* at 386 (internal quotation marks omitted). "Support[ing] [the] finding of no pre-emption" was that antitrust laws "are not aimed at natural-gas companies in particular, but rather all businesses in the marketplace," and "are far broader in their application than, for example, the [state] regulations [field-preempted as to interstate wholesale commerce] in *Northern Natural* [*Gas Co. v. State Corporation Commission of Kansas*, 372 U.S. 84 (1963)], which applied only to entities buying gas from fields within the State." *Id.* at 387.

We have little doubt that what Plaintiffs are targeting in this case are wholesale (jurisdictional) transactions. The alleged misconduct on which they base their claims is that "Defendants cut each of Plaintiffs' distributors' baseload supplies

18

of gas[] tied to the $2.55/MMBtu first-of-the-month prices, and forced them into the exponentially higher-priced spot market." Aplts. Br. at 12. This alleged misconduct is entirely in the interstate wholesale market—namely, transactions between Defendants and the distributors from whom Plaintiffs bought gas in the retail market.

Although Plaintiffs complain of the increase in retail prices, that increase was a direct result of the increase in wholesale prices. This is in sharp contrast to the situation in *Oneok*, where the price increases resulted from "marketplace conditions," 575 U.S. at 389, such as price indices, that independently affected both wholesale and retail prices—the manipulation of the indices would raise nonjurisdictional rates even if, for some reason, the jurisdictional rates were unaffected. Here, retail prices to consumers were affected only because distributors had to pay increased wholesale prices.

Plaintiffs offer two arguments against our conclusion. First, they contend that the impact of their claim on Defendants' wholesale transactions is legally irrelevant because their claim is "about the natural consequences at the retail level of Defendants' actions," and the inevitable effect on wholesale sales is simply a result of the fact that "[t]he wholesale and retail markets are not hermetically sealed from each other." Aplts. Reply Br. at 5 (internal quotation marks omitted). If the effect on wholesale sales were legally consequential, they argue, "the Court would have decided *Oneok* the other way." *Id.*

But this argument ignores the very reason why the Supreme Court resolves preemption issues under the NGA by looking at whether the *target* at which the state

19

regulation (here Plaintiffs' lawsuits) aims is the retail market or the interstate wholesale market. Knowing the target of the lawsuit is essential because any state action that regulates retail sales will have some effect on the wholesale market and any action regulating wholesale sales will affect the retail market. Given the interconnected nature of the natural-gas market, litigants could always argue that whatever the activity prohibited by state regulation, the regulation is preempted (because the activity affects wholesale markets—the argument by the pipelines rejected in *Oneok*) or is not preempted (because the activity affects retail markets— the argument of Plaintiffs here). The Supreme Court decided that the way out of this conundrum is to identify the *direct target* of the state regulation.

Perhaps it will be difficult in some circumstances to determine whether the target is jurisdictional transactions or nonjurisdictional transactions. But we think it safe to say that the target decision cannot be based solely on the fact that the jurisdictional and nonjurisdictional markets necessarily affect each other. If, for example, the contention is that the target is jurisdictional transactions, the contention must be founded on more than the fact that jurisdictional transactions are affected by the allegedly improper nonjurisdictional transactions. If that cross-market effect suffices to establish the target, then every challenge would have both jurisdictional and nonjurisdictional transactions as its target. The direct-target test would resolve nothing.

Indeed, as suggested two paragraphs ago, *Oneok* rejected an argument based on just such cross-market effects when it held that the lawsuit in that case was not

20

preempted. The defendant pipelines in *Oneok* engaged with the plaintiffs through retail sales (outside the purview of the NGA), not transactions in the wholesale market, which would have been governed by FERC. *See Oneok*, 575 U.S. at 384.[4] They argued, however, that if their retail transactions were subject to state antitrust laws, then any liability they incurred as a result could impact wholesale rates, which are under FERC's exclusive jurisdiction. *See id.* (pipelines sought certiorari "to resolve confusion in the lower courts as to whether the Natural Gas Act pre-empts retail customers' state antitrust law challenges to practices that also affect wholesale rates"); *id.* at 377 (pipelines "contend that the state antitrust claims advanced by their direct-sales customers ([the plaintiffs]) fall within" the preempted field "of matters relating to wholesale sales and transportation of natural gas in interstate commerce" (emphasis and internal quotation marks omitted)). That effect on wholesale rates was

---

[4] Plaintiffs recognize that in *Oneok* the Supreme Court characterized the transactions at issue as direct purchases of natural gas. But they contend that the opinion was incorrect to do so because "the plaintiffs did not, in fact, all" make such direct purchases. Aplts. Br. at 35. The *Oneok* plaintiffs' briefings themselves, however, described the claims as involving direct-to-consumer retail transactions. *See* Br. for Resp'ts at 1, *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015) (No. 13-271), 2014 WL 6613095, at *1 (explaining respondents "purchased gas [from petitioners] at inflated rates through retail contracts"). The defendants' briefing did too. *See* Br. for Pet'rs at 11, *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015) (No. 13-271), 2014 WL 4681794, at *11 ("Respondents allegedly paid higher prices because they bought gas [from petitioners] in retail transactions with prices pegged to the indices"); *id.* at *i ("Respondents' alleged damages resulted from retail gas purchases" and "[t]he question presented is: Does the Natural Gas Act preempt state-law claims challenging industry practices that directly affect the wholesale natural gas market when those claims are asserted by litigants who purchased gas in retail transactions"). And even if the Supreme Court got its facts wrong, the precedential weight of the opinion must be based on what the Court thought the facts were.

not enough to satisfy the direct-target test. As the district court in this case nicely put it, the Supreme Court "distinguished between" federal and state power "based on whether the regulation"—here, Plaintiffs' lawsuit attacking Defendants dealings with distributors—"aimed at the wholesale market or retail market, *regardless of the ripple effect it might have in the other market*." *In re Winter Storm Uri*, 772 F. Supp. 3d at 1262.

Plaintiffs' argument in this case is the mirror image of the rejected argument made by the pipelines in *Oneok*. The improper conduct that Plaintiffs challenge consisted solely of interstate wholesale transactions within the exclusive jurisdiction of FERC. Their claim that this litigation aims directly at nonjurisdictional transactions rests on the ripple effects of wholesale transactions on downstream retail transactions. However Plaintiffs attempt to frame their argument here, their suit aims directly at interstate wholesale transactions and practices. All the allegedly improper activity of which Plaintiffs complain concerned the prices set for interstate wholesale sales of natural gas under the exclusive jurisdiction of FERC, not "background marketplace conditions," *id.*, such as price indices, that independently affected both wholesale and retail prices. This cannot suffice.

Adding to our confidence in the resolution of this case is Supreme Court precedent interpreting the Federal Power Act (FPA). Because the FPA and NGA divide jurisdiction between FERC and the States similarly, the Supreme Court has "routinely relied on NGA cases in determining the scope of the FPA, and vice versa." *Hughes v. Talen Energy Mktg.*, 578 U.S. 150, 164 n.10 (2016).

In *FERC v. Electric Power Supply Association* (*EPSA*), 577 U.S. 260, 281 (2016), decided less than a year after *Oneok*, the Supreme Court said that a FERC regulation does not trespass the jurisdictional lines in the electricity markets "just because it affects—even substantially—the quantity or terms of retail sales." The Court explained: "It is a fact of economic life that the wholesale and retail markets in electricity, as in every other known product, are not hermetically sealed from each other," and "transactions that occur on the wholesale market have natural consequences at the retail level." *Id.* The Court concluded that "[w]hen FERC regulates what takes place on the wholesale market, as a part of carrying out its charge to improve how that market runs, then no matter the effect on retail rates, [the FPA] imposes no bar" to the federal regulation. *Id.* at 281–82. The obvious corollary is that FERC had exclusive authority over the interstate wholesale rates during Winter Storm Uri, despite their impact on retail prices. (We note that FERC examined wholesale natural-gas market activity during the storm and took no action. *See* FERC, *2021 Report on Enforcement* 79–80.)

Plaintiffs' second argument against our conclusion that their claims are preempted is that we must focus on the breadth of the statute creating their cause of action, rather than the specific conduct of which they complain. We disagree. To be sure, they correctly point out that the KCPA is a general law of broad applicability that is hardly focused on the natural-gas market. And we acknowledge that the general applicability of the state antitrust law in *Oneok* was a data point that "support[ed] a finding of no pre-emption" in that case. 575 U.S. at 387.

23

But we do not read *Oneok* as saying that the general applicability of the state statute is dispositive. Indeed, that feature of the state antitrust law in *Oneok* is mentioned only after the Court concluded that the lawsuit at issue was "firmly on the States' side of the dividing line" between preempted and nonpreempted regulation. *Id.* at 386 (internal quotation marks omitted). The general applicability of the state antitrust law does not come up in the opinion until the Court is responding to the dissenting Justices. *See* 575 U.S. at 387 (rejecting the dissent's argument that "*Schneidewind* created a definitive test for pre-emption in the natural gas context that turns on whether the matter on which the State asserts the right to act is in any way regulated by the [NGA]" (internal quotation marks omitted)).

The *Oneok* Court looked at the specific claims presented in the case, rather than just the antitrust statute in general. At the outset of the opinion, the Court described the issue before it as "whether the federal Natural Gas Act pre-empts these *lawsuits*." 575 U.S. at 376 (emphasis added). In comparing the claims in *Oneok* to precedent denying federal preemption, the Court said that the "*lawsuits* [in *Oneok*] are directed at practices affecting *retail* rates." *Id.* at 386 (first emphasis added). And in distinguishing a precedent finding preemption, the Court explained that in the prior case a "state inquiry" into the reasonableness of wholesale natural-gas purchases had been "pre-empted because it was directed at jurisdictional sales in a way that [the *Oneok*] respondents' state antitrust *lawsuits* are not." *Id.* at 389 (emphasis added). The *Oneok* "lawsuits" therefore withstood preemption because they did "not seek to challenge the reasonableness of any rates expressly approved by FERC. Rather, they

24

[sought] to challenge the background marketplace conditions that affected both jurisdictional and nonjurisdictional rates." *Id.* This analysis, which is the heart of the Supreme Court's opinion, would have been superfluous if the general scope of the state antitrust law was enough to escape preemption.

Our reading of *Oneok* (as requiring a claim-specific preemption analysis) finds further support in the Supreme Court's consideration of field preemption under federal statutes governing nuclear safety. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 82 (1990). In *English* the plaintiff brought suit under the common-law tort of intentional infliction of emotional distress—another law (not a statute) of general applicability. *See id.* The Court had previously held that federal statutes had "occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the States." *Id.* (internal quotation marks omitted). It resolved the preemption issue by closely examining "whether petitioner's tort *claim* is so related to the radiological safety aspects involved in the operation of a nuclear facility that it falls within the pre-empted field." *Id.* at 85 (emphasis added) (citation, ellipsis, brackets, and internal quotation marks omitted). The Court did not simply hold that the emotional-distress tort survived preemption because the cause of action was a law of general applicability encompassing much more than distress from nuclear-safety concerns. Instead, it focused on the particular claim, rather than the cause of action. The Court concluded that although "the claim for intentional infliction of emotional distress at issue here may have some effect" on "decisions made by those who build or operate nuclear facilities concerning radiological safety levels," "this effect is

25

neither direct nor substantial enough to place petitioner's claim in the pre-empted field." *Id.*

This focus on the actions complained of seems sound to us. The preemption of a state-law claim in an arena of federal governance should be judged by whether the conduct the claim is aimed at is conduct exclusively regulated by the federal government, not by whether the legal theory supporting the claim is general or specific, although the legal theory may provide insight into the purpose and effect of the claim.

Finally, we note that the field preemption of Plaintiffs' suit does not suggest that the NGA preempts the KCPA—or any other generally applicable state statute— in its entirety. The problem for Plaintiffs is that the specific theory of their lawsuit improperly extends the KCPA into FERC's jurisdiction.

## III.   CONCLUSION

We **AFFIRM** the district court. Plaintiffs' claims are field-preempted.